UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

FLUTRA LENA,                                        :

    Plaintiff,                                  :

        v.                                  :          No. 3:10cv893 (SRU)

MICHAEL J. ASTRUE,                               :
Commissioner of the Social
Security Administration,                           :

    Defendant.                                 :

**RULING ON PLAINTIFF'S MOTION TO REVERSE THE DECISION OF THE
COMMISSIONER AND DEFENDANT'S MOTION FOR AN ORDER
AFFIRMING THE DECISION OF THE COMMISSIONER**

This action was filed by the plaintiff, Flutra Lena, to review a final decision of the

Commissioner of Social Security that Lena is not entitled to disabled widow's benefits.  Lena has

filed a Motion to Reverse the Decision of the Commissioner [doc. # 17] seeking reversal and

remand for calculation of benefits or a new hearing, and Defendant has responded with a Motion

for an Order Affirming the Decision of the Commissioner [doc. # 18].  For the reasons set forth

below, the decision of the Commissioner is affirmed.

**I.     Background**

Lena is a widow in her early fifties who previously worked as a cook at the Southbury

Training School, a state facility.  (R. 28, 31.)[1]  While cleaning shelves at her workplace in

October 1999, a radio fell off a refrigerator and struck Lena in the head.  (R. 31-32.) As a result,

---

[1] References to the administrative record filed by the Commissioner are "R." followed by
the page number.

Lena claims she suffered, and continues to suffer, chronic pain and depression.

      A.     <u>Lena's Medical History</u>

          1.    *Treating Physicians*

Dr. Perry Shear treated Lena from April 3, 2001, through November 9, 2007. (R. 233-37, 442-57.) In 2001, he diagnosed cervical disc disease at C3-C4 and C5-C6, posttraumatic headaches and depression. Dr. Spear noted that Lena had been treated by a chiropractor for headaches and neck pain. Dr. Engel, a neurosurgeon, and Drs. Butler and Spellman, neurologists, also provided pain management. (R. 236-37, 456-57.) In 2002, Dr. Shear noted a marked decrease in extension of the cervical spine. An MRI of the cervical spine revealed disc herniation/osteophytes at C3-C4, C4-C5 and C5-C6. Dr. Shear opined that cervical disc disease caused Lena's pain. (R. 235, 453.) Because Lena preferred pain management to surgery, she was referred to Dr. Brennan. The records also reflect a psychiatric referral for treatment of depression. (R. 452.)

In 2003, Dr. Shear attributed Lena's pain to cervical disc disease and recommended nerve conduction studies to determine whether she was a candidate for surgery. (R. 234.) In 2004, Lena's continued headaches and memory loss caused Dr. Shear to consider a posttraumatic brain injury. (R. 233, 449-50.) In 2005, Dr. Shear noted no change in Lena's health and recommended psychiatric treatment for depression. He opined that depression and sleep problems were affecting Lena's cognitive abilities. (R. 447-48.)

In 2006, Dr. Shear diagnosed Lena as suffering from chronic headaches and cervical pain with bilateral upper extremity symptoms. He noted "fairly significant symptom amplification" and anxiety. He again recommended psychiatric treatment and continued pain management and

also suggested physical therapy.  (R. 444-45.)  September 2007 treatment notes indicate that, although her pain continued, Lena's psychological affect had improved significantly with medication.  (R. 442.)

Dr. Michael Brennan treated Lena from May 13, 2003 through November 2, 2009 for cervical pain and headaches.  Over the years, he tried several treatments, including medications, physical therapy, trigger point and Botulinum toxin injections and acupuncture, with no or limited success.  (R. 177-203, 253-55, 316-54, 384-88.)  At his initial examination in May 2003, Dr. Brennan noted that, in addition to experiencing complex pain, Lena suffered from severe depression and anxiety.  In addition to proposing therapies and diagnostic treatment for pain, Dr. Brennan recommended psychiatric and psychological therapy.  (R. 199-200.)  In January 2006, Dr. Brennan again recommended a psychiatric consultation.  (R. 187.)

In January and February 2006, Lena was treated at Associated Neurologists of Southern Connecticut.  (R. 426-36).  Lena complained of anxiety, depression and neck pain.  (R. 426.) The doctor[2] noted mild, non-focal tenderness of the cervical spine and suggested that Lena's complaints were mostly psychological. (R. 428-29.)  The doctor noted an unusual pattern of symptoms, something seen when the individual is feigning a psychological illness.  (R. 436.)

Drs. Lazaro Pomeraniec and John Rogowski provided mental health treatment from April 17, 2007 through December 1, 2009.  Dr. Pomeraniec completed periodic evaluation forms for worker's compensation reviews, but his treatment notes are difficult to read.  In September 2007, Dr. Pomeraniec reported that Lena suffered from major depression, dysthymia, personality

---

[2] The defendant states that the treating physician was Dr. Palmer.  There is no legible signature in the records.

disorder and chronic pain.  He rated her GAF score as 50 and opined that Lena required long-term psychotherapy and psychopharmacological treatment.  (R. 215-16.)

In March 2008, Dr. Pomeraniec diagnosed Lena as suffering from dysthymia, major depression, anxiety disorder and personality disorder.  She displayed fair attention and judgment with poor short-term memory and poor insight.  Dr. Pomeraniec rated Lena as having an obvious problem using appropriate coping skills to meet the ordinary demands of a work environment, handling frustration appropriately, interacting appropriately with others, getting along with others without distracting them by her behavior, focusing long enough to complete assigned simple activities or tasks, and performing basic work activities at a reasonable pace.  He opined that she had a serious problem carrying out multi-step instructions, changing from one simple task to another and performing work on a sustained basis of eight hours per day, five days per week.  (R. 238-41.)

The following month, Dr. Pomeraniec completed a second evaluation form.  The second form contains some differences.  Lena's ability to handle frustration, to focus long enough to complete assigned simple tasks and to perform basis work activities at a reasonable pace worsened from obvious problems to serious problems and her ability to perform work on a sustained basis worsened from a serious problem to a very serious problem.  Her ability to get along with others without distracting them improved from an obvious problem to a slight problem and her ability to change from one simple task to another improved from a serious problem to an obvious problem.  (R. 265-68.)

Dr. Rogowski also completed an evaluation form in April 2008.  (R. 260-63.)  He noted that Lena had severe chronic pain that interfered with her ability to perform even simple tasks

4

and impaired her concentration, attention and ability to deal with stress. (R. 261.)  Dr. Rogowski described Lena's judgment as fair and her insight as good.  He rated Lena as having a serious problem using appropriate coping skills, handling frustration appropriately, getting along with others without distracting them, carrying out multi-step instructions, changing from one simple task to another and performing basis work activities at a reasonable pace.  She had a very serious problem performing work activity on a sustained basis.  Dr. Rogowski noted that Lena's impaired concentration and attention, depression and anxiety would contribute to unreliable attendance at work and inconsistent performance.  In addition, the length of time she could work and the tasks she could perform would be limited by her pain.  (R. 261-62, 273-76.)

Drs. Pomeraniec and Rogowski completed evaluations in August 2008.  Dr. Pomeraniec's evaluation was identical to his April 2008 evaluation. (R. 303-08.)  Dr. Rogowski's evaluation showed slight improvement in Lena's ability to change from one simple task to another and slight worsening of her ability to focus long enough to complete assigned simple activities.  (R. 309-12.)

Finally, on December 1, 2009, Dr. Pomeraniec completed a Mental Residual Functional Capacity Questionnaire.  (R. 463-68.)  He diagnosed Lena with major depression and dysthymia and described her as feeling depressed, anxious and hopeless.  Dr. Pomeraniec characterized Lena as being seriously limited but not precluded from maintaining regular attendance and being punctual, sustaining an ordinary routine without special supervision, working with or near others without being unduly distracted, and getting along with coworkers without unduly distracting them.  He rated Lena as unable to meet competitive standards in the following categories: completing a normal workday and workweek without interruptions from psychologically based

5

symptoms, performing at a consistent pace without an unreasonable number and length of rest periods, accepting instruction and responding appropriately to supervisors, responding appropriately to changes in the work setting, and dealing with normal work stress.  (R. 465.)  He stated that Lena would be unable to deal with the stress of semiskilled and skilled work and would be absent from work more than four days per month.  (R. 466-67.)

2.     *Consultative and Examining Physicians*

Consultative examinations were performed and record reviews were completed by several physicians in connection with Lena's worker's compensation and disability insurance claims.

In November 2004, Lena underwent a neuropsychological evaluation by Dr. Richard Delaney at Gaylord Hospital.  (R. 269-72.)  Dr. Delaney noted that Lena suffers from chronic pain as a result of a mild concussive-type injury.  He noted that her post-concussive deficits in concentration, processing speed and recent memory should have resolved within a few months and not persisted with worsening over the years.  Dr. Delaney stated that Lena displayed vacillating effort during the evaluation but found evidence of chronic pain syndrome with depression and poor sleep.  He recommended psychotherapy, coaching for skills relating to pain management and cognitive-behavior therapy.  (R. 272.)

In September 2006, Dr. Kimberlee J. Sass conducted a neuropsychological evaluation. (R. 393-418.)[3]  In her Diagnostic Consultation Summary, Dr. Sass chronicles Lena's treatment from October 20, 1999, through the date of the evaluation.  She includes summaries of several medical reports not contained in the record.  In December 1999, Lena began treatment with a

_____

[3] Two pages of the twenty-eight page September 30, 2006 report are not contained in the record.

6

chiropractor.  She showed no improvement in the first month.  In February 2000, Lena began

treatment with neurologist Dr. Edward Spellman for complaints of headache, neck, shoulder and

low back pain, photophobia, imbalance and weakness in her arms.  Dr. Spellman prescribed

medication and encouraged Lena to continue chiropractic treatment.  A June 2000 MRI of the

head was within normal limits.

Dr. Sass reported that, in August 2000, Lena saw a second neurologist, Dr. Edward

Fredericks, who noted that Lena seemed depressed and should receive psychiatric treatment.  He

noted malingering and lack of motivation to return to work.  Dr. Fredericks characterized Lena's

behavior during his examination as "fraudulent."  (R. 396.)  At the same time as Dr. Fredericks

questioned Lena's complaints, Dr. Spellman validated the same complaints and referred Lena to

a clinic for pain management.  She was treated at the clinic by Dr. Madeline Kitaj.  Lena did not

take any of the medications prescribed by Dr. Kitaj because her worker's compensation carrier

would not pay for the medications.  In January 2001, Dr. Kitaj prescribed narcotic pain

medication on the condition that Lena try to return to work.  Lena took the medication but did not

return to work.  In March 2001, Dr. Kitaj noted that Lena's complaints of motor weakness varied

from month to month and Lena exerted minimal effort during examination.  Although she

appeared to question Lena's veracity, Dr. Kitaj continued to prescribe narcotic pain medication.

(R. 396-97).

The medical records Dr. Sass summarized contained another set of differing opinions.  In

April 2002, Dr. Finn, an independent medical examiner, noted treatment records showed upper

extremity strength within normal limits and diagnosed a post-concussive syndrome with probable

organic mental syndrome and anosmia, cervical spine flexion/extension injury superimposed

upon pre-existing degenerative changes in the cervical spine, and depression. (R. 397-98). He opposed surgical treatment and recommended psychiatric treatment. The following day, Lena was examined by treating neurologist Dr. Gerrard Girasole who found profound weakness in both arms and recommended immediate surgery for decompression of the spinal cord. (R. 398.)

Dr. Sass conducted a clinical interview and testing. She opined that Lena had recovered from any neurological effects of the October 1999 concussion and diagnosed major depression which had not been adequately treated. Dr. Sass considered functional improvement unlikely without psychiatric care. She recommended three to six months of psychiatric care and psychological counseling, but concluded that Lena was able to work at least part-time immediately and full-time after a few months. (R. 418.)

In May 2007, Lena underwent a second neurological consultative examination with Dr. Harry Engel. (R. 419-25.) The first examination was in January 2000. Dr. Engel noted that his impression in 2000 was that many of Lena's complaints were confabulated, produced for the benefit of the examiner. (R. 420.) He thought the complaints were being reinforced by her various treating physicians who ordered new tests and changed her diagnosis with each visit. He considered Lena to need no further treatment regarding the neck injury but thought she required treatment for major depression. In 2007, Dr. Engel agreed with Dr. Sass' assessment that Lena has a significant psychiatric problem with acute depression but no pathology of the neck that would require surgical intervention, eipdural steroids or other pain treatment. Dr. Engel opined that Lena was capable of part-time employment.

In March 2008, consultant Dr. Stephen Heller completed a Physical Residual Functional Capacity Assessment. (R. 295-302.) He based his opinions on medical records of Drs. Brennan

and Shear as well as October 2007 testing of the cervical spine.  Dr. Heller opined that Lena could lift twenty pounds occasionally and ten pounds frequently.  She could sit, stand or walk for about six hours in an eight-hour workday and had an unlimited ability to push or pull.  Lena could never climb ladders, ropes or scaffolds, but could occasionally climb stairs or ramps, balance, stoop, kneel, crouch and crawl.

In May 2008, consultant Dr. Lewis Goldberg completed a Psychiatric Review Technique form and a Mental Residual Functional Capacity Assessment.  (R. 277-94.)  Dr. Goldberg found that, during the period from November 4, 2004, through June 30, 2007, treating physicians had noted depression characterized by loss of interest in almost all activities and difficulty concentrating or thinking, anxiety-related disorders and personality disorders.  As a result of these disorders, Dr. Goldberg indicated that Lena had mild limitations of activities of daily living, and moderate limitations in maintaining social functioning and maintaining concentration, persistence and pace.  She had no episodes of decompensation of extended duration.

In the Mental Residual Functional Capacity Assessment, Dr. Goldberg found that Lena was moderately limited in her abilities to understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule and be punctual, work in coordination with others without being distracted by them, complete a normal workday and workweek without interruption from psychologically based symptoms, interact appropriately with the general public, get along with coworkers without distracting them, and travel in unfamiliar places or use public transportation. In all other categories, Dr. Goldberg rated Lena as not significantly limited.

Finally, in October 2009, physical therapist Toby MacDonald completed a functional

capacity assessment.  (R. 355-68.)  He relied on Lena's statement that she could sit for only twenty minutes at a time and walk for only ten minutes.  Testing determined that she could stand for fifteen minutes.  Based on isometric testing, the therapist concluded that Lena could not perform at the sedentary level of exertion.  She was unable to lift ten pounds regularly from knuckles to shoulder height or from the floor to waist height.  Although test results suggested submaximal effort, the therapist concluded that her pain, identified by Lena as 7/10, prevented Lena from performing her prior job.  (R. 355-56, 360.)

        3.    *Other Reports*

In March 2008, Lena completed a report on her activities of daily living.  (R. 137-44.) She stated that her daily activities vary with her pain level.  Everything now takes longer and is more painful when she must reach, turn or grab.  She sometimes drops things.  Lena experiences pain in her neck and arms when she drives; she cannot sit or stand for long periods.  Lena reports that she is anxious and cannot sleep, cries daily, cannot focus and experiences debilitating headaches and depression.  Lena takes many medications without assistance or reminders and manages her own personal grooming.  Lena prepares simple meals when she can and does light cleaning, laundry and light yard work depending on her pain and emotional state.  She has no interests or hobbies and has lost friends because of pain, depression and memory loss.  Lena states that her impairments affect every aspect of her life.  She has difficulty following oral or written instructions.

In October 2008, Lena described her symptoms as neck pain, migraine headaches, pain radiating down her arms, depression and memory loss.  (R. 162.)  Her activities of daily living were unchanged from the previous report.  (R. 165-72.)

B.     Lena's Testimony

Lena, a widow, was fifty-one years old at the time of the hearing.  She lived with two of her three adult children.  (R. 28.)  Prior to her injury, she worked as a cook at the Southbury Training School, a state facility.  (R. 28, 31.)  She was cleaning shelves in October 1999 when a radio fell off a refrigerator and struck her in the head.  (R. 31-32.)  Lena was treated at a hospital emergency room, but was not admitted.  (R. 32.)

Lena testified that she experiences pain "all the time" in her neck and arms, her arms are weak and she experiences headaches and sleep deprivation.  (R. 34.)  Lena did not know how many pounds she could lift.  She stated only that sometimes she dropped things and broke dishes. (R. 36.)  Her short-term memory has been affected; she has trouble focusing on the task at hand. (R. 37.)  Lena stated that she has no interest in reading.  She occasionally does chores around the house or a little grocery shopping.  (R. 38.)  She drives infrequently.  Lena spends most of her day scrolling through television channels.  (R. 39.)  Lena does not travel or help care for her grandchild.  (R. 39-40.)

Lena also testified that her condition has not changed since October 1999.  (R. 40.)  She experiences daily panic attacks and often paces in her home.  Lena must lie down and rest each day.  She naps for varying periods, often for most of the day.  Medication helps her sleep between two and four hours per night.  (R. 41-42.)  Lena experiences frequent migraine headaches, which often cause her to vomit.  Medication has reduced the frequency of the headaches from three to four per week to one or two per week.  (R. 42.)   Her many medications make her tired.  (R. 43.)

C.      Administrative Procedural History

1.      *Lena's Application for Disabled Widow's Benefits*

Lena filed a Title II application for disabled widow's benefits on February 11, 2008, alleging that she had been disabled since October 20, 1999.  (R. 92-96.)  The claim was denied at the initial level of review and upon reconsideration.  (R. 49-51, 52-54.)  Lena then filed a request for a hearing before an Administrative Law Judge ("ALJ").  (R. 57-58.)  On December 7, 2009, a hearing was held before ALJ Ronald J. Thomas.  (R. 24-45.)  Lena was represented by Attorney Ivan Katz.  The ALJ issued his written decision on February 24, 2010, finding that Lena had not been under a disability from October 20, 1999, through the date of the decision.  (R. 4-23.)  Lena's case was selected for review by the Decision Review Board ("DRB").  On June 2, 2010, the DRB notified Lena that it had not completed its review during the time allowed, thereby rendering the decision of the ALJ the final decision of the Commissioner subject to review by this court.  (R. 1-3.)  Lena then filed this action seeking a remand for entry of judgment and an award of benefits or a new hearing before a different ALJ.

2.      *ALJ's Decision*

The ALJ applied the required five-step sequential evaluation process set forth in the Regulations.  (R. 7-18.)  *See* 20 C.F.R. § 404.1520.  At step one, the ALJ determined that Lena had not engaged in any substantial gainful activity since her alleged onset date.  At step two, he found that Lena had three severe impairments, degenerative disc disease of the cervical spine, headaches and depression.  At step three, however, the ALJ determined that Lena did not have an impairment or combination of impairments that met or medically equaled a listed impairment.  The ALJ found that Lena had the residual functional capacity to perform light work with the

following exceptions:  she could lift and carry only up to twenty pounds occasionally and only up to ten pounds frequently; she could sit, stand or walk only six hours of an eight-hour workday; she was limited to occasional bending, stooping, twisting, squatting, kneeling, crawling and climbing; and she was restricted to a supervised, low-stress environment, *i.e.*, an environment requiring few decisions.  Considering the residual functional capacity assessment, the ALJ found that Lena could not perform her past relevant work, but that there were jobs existing in sufficient numbers in the national economy that she could perform.  Thus, the ALJ found that Lena was not disabled at any time from October 20, 1999, through the date of the decision.

## II.    Standard of Review

Disability is defined by the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 416(i)(1)(A).  "An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

"A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error."  *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000) (citing 42 U.S.C. § 405(g); *Bubnis v. Apfel*, 150 F.3d 177, 181 (2d Cir. 1998)).  "Substantial evidence means more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008) (internal quotation omitted). "To determine whether the findings are supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Brown v. Apfel*, 174 F.3d 59, 61-62 (2d Cir. 1999) (quoting *Mongeur v. Heckler*, 772 F.2d 1033, 1038 (2d Cir. 1983) (per curiam)). For errors of law, however, the deferential standard does not apply. *See Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) ("'[W]here an error of law has been made that might have affected the disposition of the case, this court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the ALJ. Failure to apply the correct legal standards is grounds for reversal.'") (quoting *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984)).

"To determine whether the Commissioner's decision is supported by substantial evidence, the court must consider the entire record, examining the evidence from both sides." *Malloy v. Astrue,* 2010 WL 7865083, at *1 (D. Conn. Nov. 17, 2010) (citing *Williams v. Bowen*, 589 F.2d 255, 258 (2d Cir. 1988)). The Commissioner's decision will be upheld so long as there is evidence that "a reasonable mind might accept as adequate to support [the] conclusion" being challenged. *Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002) (internal quotation marks and citations omitted). Thus, the role of this court is not to decide the facts anew, reevaluate the facts, or substitute its judgment for that of the ALJ, but to determine whether the ALJ's decision would be acceptable to a reasonable person based on the evidence in the record. *See id*. Under the standard of review set forth above, absent an error of law, this court must uphold the Commissioner's decision if it is supported by substantial evidence even if this court might have

14

ruled differently. *See Eastman v. Barnhart*, 241 F. Supp. 2d 160, 168 (D. Conn. 2003). The court's responsibility "is always to ensure that a claim has been fairly evaluated." *Brown*, 174 F.3d at 62 (quoting *Grey v. Heckler*, 721 F.2d 41, 46 (2d Cir. 1983)). "Although the standard for review generally implies a deference to the expertise of the agency, the courts retain a responsibility . . . to reverse and remand if the Secretary's decision is not supported by substantial evidence." *Austin v. Astrue*, 2010 WL 7865079, at *7 (D. Conn. Sept. 30, 2010) (quoting *Rivera v. Schweiker*, 717 F.2d 719, 723 (2d Cir. 1983) (internal quotation marks omitted)).

## III.  Discussion

Lena raises six arguments on appeal. First, the ALJ did not properly evaluate the medical evidence because he relied on evidence not contained in the record, made improper credibility findings and did not properly evaluate Lena's mental and physical impairments. Second, the ALJ failed to apply the treating physician rule. Third, the ALJ improperly evaluated Lena's complaints of pain. Fourth, the ALJ failed to develop the administrative record. Fifth, the ALJ did not adequately assess the combination of her impairments. Finally, the ALJ failed to adequately consider the 2009 functional capacity assessment.

### A.  Evaluation of the Medical Evidence

#### i.  *Reliance on Medical Evidence Not in the Record and Affirmative Duty to Develop the Record*

Lena contends that the ALJ's recitation of her medical history is based on summaries of treatment records included in a consultative report rather than on the records themselves. She also notes that two pages of Dr. Sass's consultative report are missing from the record. Lena argues that the ALJ had a duty to obtain these records.

Like the claimant, the ALJ has a duty to create a full and fair record in a disability proceeding. *See* 20 C.F.R. § 404.1512(d) (describing steps the ALJ will take to develop claimant's medical record); *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996) ("Because a hearing on disability benefits is a non-adversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record . . . . This duty exists even when the claimant is represented by counsel." (citation omitted)).

Lena first argues that the ALJ relied on incompetent evidence because he cited summaries of medical reports included in Dr. Sass's consultative report rather than requesting copies of the reports for the administrative record. The defendant contends that this claim is without merit because hearsay is admissible in agency proceedings and, in any event, Lena failed to demonstrate how she was prejudiced by the absence of the additional reports.

The Supreme Court has held that medical reports from treating and consultative physicians, although hearsay, are admissible as evidence in disability hearings up to the point of relevancy. *Richardson v. Perales*, 402 U.S. 389, 402-06, 410 (1971). The Sixth Circuit has included within this exception to the hearsay rule notations in one doctor's report of the opinions of another doctor. *See Hickey-Haynes v. Barnhart*, 116 Fed. App'x. 718, 724 n.3 (6th Cir. 2004). Thus, the ALJ's citation to relevant summaries of medical reports contained in Dr. Sass's consultative report does not, in itself, show errant reliance on incompetent evidence.

Moreover, the defendant points out that Lena failed to show how she was prejudiced by the ALJ's failure to obtain copies of the additional medical reports. *See Nelson v. Apfel*, 131 F.3d 1228, 1235 (2d Cir. 1997) ("Mere conjecture or speculation that additional evidence might have been obtained in the case is insufficient to warrant a remand.") (quotation omitted); *Perez*,

16

77 F.3d at 48 (holding that ALJ's omission of retrospective medical analysis was not reversible error because "there was nothing presented at the hearing to indicate that retrospective assessments would have revealed any useful information or that the physicians were prepared to undertake such assessments").  To demonstrate prejudice Lena must show that the additional medical reports would "undermine[] the ALJ's decision."  *King v. Astrue*, 3:09cv100(SRU), slip op. at 20-22 (D. Conn. Sept. 22, 2010) (unpublished).

In this case, Dr. Sass summarized the opinions of several doctors in her consultative report, some of which suggested that Lena's symptoms may have been overstated.  Lena has not, however, obtained the original reports nor has she provided any evidence that the summaries are incorrect.  On the contrary, the summaries are corroborated by other evidence in the record.  Both Dr. Engel, an examining physician, and Dr. Shear, a treating physician, indicated in reports included in the record that Lena's complaints were exaggerated.  (R. 229, 419-25.)  Moreover, Dr. Sass's testing showed that some of her complaints were overstated.  (R. 408, 411, 417.)  Although two pages are missing from Dr. Sass's lengthy report, Lena has made no showing that the missing pages are material or that their absence undermined the result.  *See King*, slip op. at 20-22.  Absent any showing of prejudice, the ALJ did not fail to meet his burden of developing the record and did not rely on incompetent evidence in deciding this case.  *See McLeod v. Astrue*, 640 F.3d 881, 888 (9th Cir. 2011) (interpreting *Shinseki v. Sanders*, 129 S. Ct. 1696 (2009), to require the party claiming error to demonstrate prejudice unless the reviewing court concludes that the question of prejudice is borderline, requiring further administrative review).

ii.    *Credibility Findings and Subjective Complaints of Pain*

Lena also challenges the ALJ's determination that her subjective complaints of pain were

17

credible only to the extent the complaints were consistent with the RFC assessment.  The

defendant contends that the ALJ's credibility determination is supported by substantial evidence.

When evaluating subjective symptoms, such as pain, a claimant must first demonstrate

the existence of a medically determinable impairment that could reasonably be expected to

produce the symptoms.  *See* 20 C.F.R. § 404.1529(c)(1).  After such an impairment has been

identified, the intensity and persistence of the claimant's symptoms are evaluated based on all

available evidence and, "to the extent that the claimant's pain contentions are not substantiated

by the objective medical evidence, the ALJ must engage in a credibility inquiry." *Meadors v.*

*Astrue*, 370 Fed. App'x. 179, 183 (2d Cir. 2010); C.F.R. § 404.1529(c)(3)(i)-(vii).  The

symptoms will not be rejected simply because the objective medical evidence does not support

the claim.  Other factors that will be considered include the claimant's medical history, diagnosis,

daily activities, prescribed treatments, efforts to work and any functional limitations or

restrictions caused by the symptoms.  *See* 20 C.F.R. § 404.1529.

When assessing a claimant's credibility, an ALJ must consider the entire case record,

including objective medical evidence, the individual's statements about her symptoms, her

treatment, the statements of her treating or examining physicians about how the symptoms affect

her, the individual's daily activities, her medications and other information about the individual's

symptoms and how those symptoms affect her ability to work.  *See* 20 C.F.R. § 416.929(c)(1)-

(3); SSR 96-7p, 1996 WL 374186, at *1 (July 2, 1996).  A strong indication of the credibility of a

claimant's statements is their consistency, both internally and with other information in the case

record.  *See* SSR 96-7p, at *5-6; *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979).  An ALJ

must compare a claimant's statements made in connection with her claim with statements she

18

made under other circumstances that are in the case record; statements a claimant made to treating and examining medical sources are especially important.  *See* SSR 96-7p, at *5.

The ALJ found that Lena suffered from a severe physical impairment, one that could be expected to produce pain.  He did not, however, credit all of her complaints concerning the intensity, persistence and limiting effects of that pain.  The ALJ cited several reasons in support of his credibility determination.  First, he noted that the record lacked objective medical evidence supporting extreme back and neck pain, headaches and difficulty concentrating.  Moreover, Drs. Sass and Engel noted the lack of correlation between Lena's subjective complaints and the medical evidence and, along with treating physician Dr. Shear, suggested misrepresentation or fabrication of symptoms.

Lena argues that she may have overstated her pain for psychological reasons.  The experience of pain is a subjective phenomenon that is difficult to evaluate.  Although "[p]ain itself may be so great as to merit a conclusion of disability," *Rivera v. Schweiker*, 717 F.2d 719, 724 (2d Cir. 1983), the ALJ properly engaged in a credibility inquiry because the level of pain Lena complained about was not corroborated by the medical evidence.  In assessing credibility, however, the ALJ only needed to determine *that* Lena's complaints were overstated, not *why* they were overstated.  The credibility determination does not turn on moral culpability, so the question of whether Lena exaggerated her symptoms purposefully, or whether her depression was to blame, is irrelevant.  Rather, the only issue the ALJ was required to address was whether Lena's impairments supported her stated complaints of pain.  The record contains evidence, including the opinion of one of Lena's treating physicians, supporting the ALJ's decision rejecting Lena's complaints of pain to the extent alleged.  The ALJ's determination is supported

by substantial evidence in the record.

   B.     Treating Physicians' Rule

   Lena argues that the ALJ failed to apply the treating physicians' rule because he did not

credit the opinions of Drs. Pomeraniec, Rogowski and Shear, over the opinions of consultative or

examining physicians.

   For a physician's opinion to be given controlling weight, the following criteria must be

met:  (1) the opinion must be from a treating source; (2) the opinion must be a medical opinion

concerning the nature and severity of the plaintiff's impairment; and (3) the opinion must be

well-supported by medically accepted "clinical and laboratory diagnostic techniques."  SSR 96-

2p.   If the treating physician's opinion is not supported by objective medical evidence or is

inconsistent with other substantial evidence in the record, the ALJ need not give the opinion

significant weight.  *See Poupore v. Astrue*, 566 F.3d 303, 307 (2d Cir. 2009).

   The ALJ rejected Dr. Pomeraniec's opinions for several reasons.  First, Dr. Pomeraniec

relied extensively on Lena's description of her symptoms.  Because the ALJ found Lena's

subjective complaints not entirely credible, Dr. Pomeraniec's reliance on the same statements led

the ALJ to question his opinions.  *Baladi v. Barnhart*, 33 Fed. App'x. 562, 564 (2d Cir. 2002)

(treating physician's opinions need not be given controlling weight when "treating physician's

opinions were based upon plaintiff's subjective complaints of pain and unremarkable objective

tests").  Second, Dr. Pomeraniec's opinions contained internal inconsistencies and differed from

other opinions in the record.  These inconsistencies undermine the validity of his opinions.  *See*

20 C.F.R. § 404.1527(d)(4) (emphasizing the importance of consistency between an opinion and

the record).  Third, Dr. Pomeraniec expressed opinions on the ultimate question of disability, not

on the nature and severity of Lena's impairments.  The ultimate question of disability is reserved

to the Commissioner.  20 C.F.R. § 404.1527(e) and (e)(1).  Finally, Dr. Pomeraniec did not

provide any objective medical evidence to support his opinions.[4]

Dr. Rogowski also relied primarily on Lena's subjective complaints.  His opinions were

contradicted by the testing done by Drs. Delaney and Sass.  In addition, Dr. Shear opined at this

same time that Lena's mood and affect were within normal limits.

The ALJ rejected Dr. Shear's opinion that Lena was disabled.  The ALJ noted that the

determination of disability was reserved to the Commissioner and also that Dr. Shear's

comments were made in the worker's compensation context, which employs a different disability

standard.  The ALJ did not reject Dr. Shear's other opinions.

The ALJ is not required to accept an opinion from a treating source that the claimant is

disabled.  *See Gladden v. Comm'r*, 337 Fed. App'x. 136, 138 (2d Cir. 2009) ("Federal

regulations make clear that whether a physician believes an applicant is 'disabled' is irrelevant,

since this determination is reserved to the Commissioner.").  In addition, the opinions of Drs.

Pomeraniec and Rogowski contradict objective medical evidence in the record.  *See Schisler v.*

*Sullivan*, 3 F.3d 563, 568 (2d Cir. 1993) (stating that the regulations "permit the opinions of

nonexamining sources to override treating sources' opinions, provided they are supported by

evidence in the record").  The ALJ's determinations regarding the weight to be afforded these

opinions are supported by substantial evidence.

---

[4] Lena's period of insured status expired on June 30, 2007.  (R. 10.)  To receive benefits, Lena must show that she was disabled before her insured status expired.  She did not begin treatment with Drs. Pomeraniec and Rogowski until April 2007.  Thus, most of their reports do not relate to the relevant time period.

C.    Evaluation of Impairments

Lena argues that the ALJ did not properly evaluate her impairments. "If the ALJ does find a medically severe combination of impairments, the combined impact of the impairments will be considered throughout the disability determination process." *Roth v. Astrue*, No. 3:08cv436(SRU)(WIG), 2008 WL 5585275, at *15 (D. Conn. Nov. 14, 2008).

Here, the ALJ repeatedly described the requirement that he consider Lena's impairments singly and in combination. He specifically found that Lena's impairments did not meet a listing either singly nor in combination. The ALJ's decision indicates that he considered all of the impairments in evaluating Lena's RFC. The fact that Lena does not agree with his findings, does not show that the ALJ failed to comply with the applicable standards.

D.    Consideration of 2009 Functional Capacity Assessment

Finally, Lena contends that the ALJ should have accepted the 2009 functional capacity evaluation. Lena is required to show that she was disabled during the period she was insured. *See* 42 U.S.C. § 423(c); 20 C.F.R. §§ 404.101, 404.130-404.131. Lena's insured status expired on June 30, 2007. (R. 10.) This evaluation was performed two years after Lena's date last insured and considered Lena's current abilities. There is nothing in the report to indicate Lena's abilities during the relevant period. Although Lena argues that her condition had not changed significantly, the ALJ found Lena not entirely credible.

The ALJ concluded that the evaluation was questionable in light of other evidence of record. For example, the evaluation indicated that Lena had limited strength and was unable to lift ten pounds on a regular basis. In November 2007, however, treating physician Dr. Shear indicated that Lena had upper body strength, strong grip strength and full or good arm strength.

(R. 226.)  Although Lena complained of weakness, Dr. Shear detected no weakness.  In addition, Dr. Engel found that Lena's hand strength ratings were substantially higher than those in the evaluation.  (R. 423.)  Based on this evidence, it was reasonable for the ALJ to conclude that Lena's complaints were exaggerated and reject the evaluation.

In addition, the evaluation was performed by a physical therapist, not a physician.  A physical therapist is not considered an "acceptable medical source" but is an "other source."  Unlike acceptable medical sources, the ALJ was not required to consider evidence from other sources.  *Compare*  20 C.F.R. § 404.1513(c) (an ALJ "will" consider the assessments of acceptable medical sources) *with* 20 C.F.R. § 404.1513(d) (an ALJ "may" use evidence from other sources).

## IV.    Conclusion

The plaintiff's Motion to Reverse the Decision of the Commissioner [**doc. #17**] is **DENIED**.  The defendant's Motion for an Order Affirming the Decision of the Commissioner [**doc. #18**] is **GRANTED**.  The Clerk is directed to enter judgment and close this case.

It is so ordered.

Dated at Bridgeport, Connecticut, this 20th day of January 2012.

/s/ Stefan R. Underhill
Stefan R. Underhill
United States District Judge